**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR-07-0090-PHX-JAT |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Arturo Meza-Beltran, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

Pending before the Court is Defendant's Motion to Suppress (Doc. # 18).   The Government filed a Response to Defendant's Motion to Suppress (Doc. # 24), and Defendant replied (Doc. # 27).

In the Suppression Motion, Defendant seeks to suppress certain statements and evidence obtained during a warrantless search of his home.  Defendant seeks suppression on the following grounds: (1) the warrantless search was unreasonable because the alleged consent was not freely and voluntarily given, if at all (Doc. # 18 at 2), and (2) Defendant's reinitiation of contact after he invoked his rights to silence and counsel was involuntary (Doc. # 18 at 2), or (3) the officers did not cease interrogation of Defendant after he invoked his right to counsel (Doc. # 18 at 4).  The Government responds that Defendant's brother had apparent authority to consent to the search, he did so freely and voluntarily, Defendant's

1   reinitiation was voluntary, and the officers ceased interrogation upon Defendant's invocation
2   (Doc. # 24 at 1-3).

3   **I.    FINDINGS**

4          DEA agents began an investigation of Defendant Arturo Meza-Beltran ("Arturo") in
5   January 2006, after seizing 28 pounds of cocaine from a car they alleged to have seen Arturo
6   driving.   A year later, on January 23, 2007, DEA Special Agents K.C. Henry ("Agent
7   Henry") and Alex Wild ("Agent Wild"), Task Force Officers Guillermo Biascoechea
8   ("Officer Biascoechea") and Jay Ponder ("Officer Ponder"), and Group Supervisor Charles
9   Kelley ("G.S. Kelley") approached a house at 1152 West Grant Street in Avondale, Arizona.
10  The officers had seen a vehicle, registered to Arturo, in the garage at that address on several
11  occasions.   Arturo's brother, Edgardo Meza-Beltran ("Edgardo"), answered the door upon a
12  knock from Agent Henry and Officer Biascoechea, both dressed in plain clothes with police
13  vests and holstered weapons.

14         After an evidentiary hearing on July 10, 2007, the Court finds credible the testimony
15  of Agent Henry and Officer Biascoechea that Edgardo told the officers of Arturo's residence
16  in the house, but insisted that he was not home at the time.[1]  Upon the officers' request,
17  Edgardo agreed to allow them into the house to search for Arturo.[2]  Edgardo also informed
18  the officers that he and a small child, Arturo's two year old daughter Yaneli, were the only
19  people in the house.

20         As the officers entered the home and proceeded toward the master bedroom, where
21  Yaneli was located, they heard the sound of running water and asked Edgardo if someone
22  was in the shower.   Edgardo, himself fully dressed with dry hair, replied that he had just

---

24         [1]Officer Biascoechea, a Spanish language instructor for the City of Mesa, conversed
25  with Edgardo in Spanish upon realization that Edgardo did not understand English.  Neither
    Arturo nor Edgardo alleged any lack of understanding due to language.
26

27         [2]The officers testified that Edgardo conditioned his consent on an allowance to
    accompany the officers on their search of the house.  The officers agreed to this condition.
28  Edgardo did not testify at the hearing.

1    come out of the shower.  Disbelieving his story, the officers asked Edgardo to step back into

2    the hall while they proceeded into the master bedroom.  After hearing the shower water turn

3    off, the officers entered the master bath with weapons drawn to find Arturo.  Both parties

4    agree that the officers then instructed Arturo to get on the ground, which he did, where

5    officers arrested and handcuffed him.

6         The officers then moved Edgardo and Yaneli to the living room couch, unrestrained,

7    and placed Arturo at the kitchen table at 10:50 a.m.  Before advising Arturo of his rights as

8    required by *Miranda v. Arizona*, 384 U.S. 436 (1966), Agent Henry, through Officer

9    Biascoechea's Spanish interpretation, spent approximately 25 minutes showing Arturo

10   evidence against him.  The Court finds credible the testimony of both Agent Henry and

11   Officer Biascoechea that they asked no questions of Arturo at this time.

12        Both parties agree that after being advised of his *Miranda* rights, Arturo invoked his

13   rights to both silence and counsel at 11:15 a.m., at which point direct contact with him

14   ceased.  Additionally, at some point, the officers asked Arturo for his common law wife

15   Karen Abarca's ("Ms. Abarca") mobile phone number in order to have her come home to care

16   for Yaneli, who they refused to leave with Edgardo after they found him untrustworthy.

17   Arturo offered the number but when Ms. Abarca did not respond, the officers testified to

18   have sought and received permission to look around the kitchen for a work phone number.

19   Both Ms. Abarca and Agent Henry testified that Agent Henry reached her by phone and

20   informed her that Arturo had been placed under arrest.  The parties further agree that Agent

21   Henry told Ms. Abarca that she should come home immediately to take care of Yaneli or the

22   officers would have to call Child Protective Services ("CPS") for assistance.

23        The officers testified that at 11:50 a.m., Arturo reinitiated contact with them.  Between

24   11:15 a.m., when Arturo invoked his rights, and approximately 11:50 a.m., when reinitiation

25   occurred, the officers continued to process the scene, made notes, and also conducted

26   inventory searches on the two vehicles in Arturo's garage.  Arturo alleged and testified that

27   G.S. Kelley made promises and threats during the time between invocation and reinitiation,

28   including threats to arrest Edgardo and Ms. Abarca, deport Ms. Abarca's school-aged

1  daughter, turn Yaneli over to CPS, and a promise of a lesser sentence if Arturo gave certain

2  information or evidence to the officers.  The Court, however, finds credible the testimony of

3  G.S. Kelley, who conceded to have discussed with Edgardo the importance of truthfulness

4  when speaking to police and informing him of the legal ramifications of  making false

5  statements to law enforcement as well as the potential need for CPS to take care of Yaneli

6  if Ms. Abarca could not return.  G.S. Kelley admits that these statements, while not directed

7  toward Arturo, were likely loud enough for Arturo to hear while sitting in the next room.

8  G.S. Kelley, Agent Henry, and Officer Biascoechea all testified that they "promised" to

9  inform the prosecutor and the judge of Arturo's cooperation if he spoke with them.

10  Both parties agree that after 11:15 a.m., Arturo requested to speak with G.S. Kelley,

11  who informed Arturo that he could not speak with him since Arturo had invoked his *Miranda*

12  rights.  Arturo then agreed to reinitiate contact with G.S. Kelley and revoked the invocation

13  of his rights in order to speak, after which he made incriminating statements that the

14  Government seeks to use at trial.  Finally, Ms. Abarca and the officers testified that when she

15  arrived home after receiving Agent Henry's phone call, and apparently after Arturo's

16  confession, she gave consent to search the home.

17  **II.   DISCUSSION**

18  **A. Consent to Search**

19  The Government does not allege that Edgardo had actual authority to consent to a

20  search of the residence, but instead alleges apparent authority based on the statement that

21  Edgardo was the only adult at home.  "To the Fourth Amendment rule ordinarily prohibiting

22  the warrantless entry of a person's house as unreasonable *per se*, one jealously and carefully

23  drawn exception recognizes the validity of searches with the voluntary consent of an

24  individual possessing authority." *Georgia v. Randolph* 126 S.Ct. 1515, 1520 (2006) (internal

25  citations omitted).  The validity of consent, a question of fact, depends on the totality of the

26  circumstances.  *U.S. v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004).

27  Additionally, the Government bears the burden to prove that consent was freely and

28  voluntarily given. *Patayan Soriano*, 361 F.3d at 501.  The Ninth Circuit provides five factors

1   to determine whether consent to search is voluntarily given: (1) whether the defendant was

2   in custody; (2) whether the arresting officers had drawn their guns; (3) whether *Miranda*

3   warnings had been given; (4) whether officers notified the defendant that he had a right not

4   to consent; and (5) whether the defendant was told that a search warrant could be obtained

5   if he refused. *Id*. at 502.

6       Arturo alleges that Edgardo did not consent to the search. He also alleges that, even

7   if valid and voluntary consent was obtained, the officers exceeded the scope of consent,

8   thereby invalidating the search. "The standard for measuring the scope of a suspect's consent

9   under the Fourth Amendment is that of objective reasonbleness - what would the typical

10  person have understood by the exchange between the officer and the suspect?" *U.S. v.*

11  *Cannon*, 29 F.3d 472, 477 (9th Cir.1994) (internal quotations omitted).

12      Here, the Court finds that Agent Henry and Officer Biascoechea's observation of

13  Edgardo's apparent authority over the home was reasonable and warranted by the totality of

14  the circumstances. The officers reasonably relied on Edgargo's appearance of control over

15  the home and his comment that Arturo, the adult they anticipated to find, was not home at

16  the time. Additionally, Edgardo was not in custody, thus no *Miranda* warnings were

17  necessary, and the officers' uncontradicted testimony was that they did not have their

18  weapons drawn. Officer Biascoechea testified that he informed Edgardo of his right to refuse

19  consent, although the officers did not tell Edgardo that they could obtain a search warrant.

20  Considering the totality of the circumstances, the Court finds that Edgardo did consent, and

21  that his consent was voluntary. The only contradicting testimony at the evidentiary hearing

22  came in the form of hearsay from Ms. Abarca, who heard from Edgardo that the officers

23  never obtained consent but pushed their way into the house with weapons drawn. The Court

24  accepts the credibility of the officers' testimony and does not find the contradicting story

25  convincing.

26      Finding valid and voluntary consent from Edgardo, the Court does not agree that the

27  officers exceeded the scope of consent granted. From the testimony presented at the

28  evidentiary hearing, it appears that the officers sought permission to enter for the limited

1   purpose of searching for Arturo himself.  The officers conformed to the consent, evidenced

2   by their immediate and limited search for Arturo in the home, until the officers found and

3   arrested Arturo.

4       **C. Defendant's Confession**

5       A defendant can establish a constitutional violation by showing either that the

6   confession was involuntary, or that the officers continued interrogation after the defendant's

7   invocation of *Miranda* rights.  *Dickerson v. U.S.*, 530 U.S. 428, 432 (2000).    "The

8   requirement that *Miranda* warnings be given does not, of course, dispense with the

9   voluntariness inquiry.  But...cases in which a defendant can make a colorable argument that

10  a self-incriminating statement was compelled despite the fact that the law enforcement

11  authorities adhered to the dictates of *Miranda* are rare." *Id.* at 444 (internal citation omitted).

12  When a suspect waives previously invoked rights by reinitiating a conversation with law

13  enforcement officers, the waiver must be knowingly and intelligently made, based on a

14  totality of the circumstances.  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983).

15      **1. Involuntariness**

16      To ensure due process, the test for determining the voluntariness of a suspect's

17  confession is whether, considering all the circumstances, the Government obtained the

18  statement by physical or psychological coercion or by inducement so that the suspect's will

19  was overcome.  *U.S. v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v.*

20  *Washington*, 373 U.S. 503, 513-14 (1963)).  Additionally, "[a] statement is involuntary if it

21  is extracted by any sort of threats or violence, [or] obtained by any direct or implied

22  promises, however slight, [or] by the exertion of any improper influence." *Id.* (quoting *Hutto*

23  *v. Ross*, 429 U.S. 28, 30 (1976)).  Courts also consider the defendant's age, education, the

24  nature of any questioning, and the use of any physical punishment such as the deprivation

25  of food or sleep to determine voluntariness.  *U.S. v. Haswood*, 350 F.3d 1024, 1027 (9th Cir.

26  2003) (citing *Schenckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

27      Here, the Court finds that Arturo's confession was voluntary and not coerced.  Since

28  no one involved has suggested any physical coercion, the Court looks to testimony from the

1    evidentiary hearing to determine psychological coercion.  Neither Arturo's age nor his

2    education were presented to the Court, and no allegations challenged his ability to understand

3    the officers and agents during the process of reinitiation, at least through Officer

4    Biascoechea's interpretation.  The Court believes the testimony of G.S. Kelley that he made

5    no threats and offered no promises, other than the assurance that any cooperation by Arturo

6    would be known throughout a subsequent prosecution.  An audio tape played at the

7    evidentiary hearing corroborates the testimony, providing reason to believe that Arturo

8    understood the nature of G.S. Kelley's assurances and wished to speak based on his own will.

9       Arturo alleges that the officers' threat to summon CPS renders his confession

10   involuntary.  Although officers testified that Arturo clearly expressed a concern for Yaneli,

11   the Court cannot find that the mere mention of CPS renders a confession involuntary.  The

12   Court does recognize the potential for concern when officers suggest turning a child over to

13   CPS, but it remains the officers' duty to ensure the safety of a child during the course of a

14   home arrest, which includes securing supervision by CPS if no appropriate adult will remain

15   at a residence to care for a child.  Moreover, Agent Henry's testimony provides that he

16   contacted Ms. Abarca to inform her of Arturo's arrest and to give her an opportunity to return

17   home for Yaneli, and that Arturo himself gave Agent Henry her phone number for that

18   purpose and was aware of his reason for calling her.

19                    **2. Interrogation**

20       Subsequent to the Supreme Court's articulation of a right to the assistance of counsel

21   in *Miranda*, the Court held, in *Edwards v. Arizona*, "that an accused...having expressed his

22   desire to deal with the police only through counsel, is not subject to further interrogation by

23   the authorities until counsel has been made available to him, unless the accused himself

24   initiates further communication, exchanges, or conversations with the police." 451 U.S. 477,

25   484-85 (1981).  The Supreme Court has defined "interrogation" for the purpose of *Miranda*

26   safeguards as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446

27   U.S. 291, 300-01 (1980).  "That is to say, the term 'interrogation' under *Miranda* refers not

28   only to express questioning, but also to any words or actions on the part of the police (other

1    than those normally attendant to arrest and custody) that the police should know are

2    reasonably likely to elicit an incriminating response from the suspect." *Id.*

3           Here, the Court finds that the officers ceased interrogation after Arturo invoked his

4    *Miranda* rights to silence and counsel.  The credible testimony of Agent Henry, Officer

5    Biascoechea, and G.S. Kelley provides that all direct questioning stopped immediately upon

6    Arturo's invocation, a fact which Arturo does not appear to dispute.  The only issue remains

7    whether or not officers continued to "interrogate" Arturo based on their conversations with

8    each other within his earshot.

9           Paying close attention to the language in *Innis* as applied to this case, it does not

10   appear that the officers used any words or actions other than those normally attendant to

11   arrest and custody.  As in the voluntariness analysis above, the mere fact that officers

12   mention CPS during the course of a home arrest in which a small child is present does not

13   create an "interrogation" for purposes of *Miranda*.  Officers must take the necessary steps to

14   secure appropriate supervision for a child during custody and arrest, and without more, a

15   reference to CPS is not "reasonably likely to elicit an incriminating response."  Additionally,

16   the Court does not find that any of G.S. Kelley's discussions with Edgardo rose to the level

17   of "interrogation" of Arturo, particularly since G.S. Kelley testified that such statements were

18   merely conversational statements to Edgardo and not threatening nor directed at Arturo.

19   **III.    CONCLUSION**

20         Based on the foregoing, the Court finds that the officers did not violate Defendant's

21   rights in their initial search of the home, nor in their questioning of Defendant following

22   Defendant's reinitiation of contact with the officers.  Therefore, none of Defendant's

23   statements will be suppressed. Additionally, Ms. Abarca testified at the hearing that she gave

24   consent for a search of the home.  Therefore, none of the physical evidence obtained at the

25   home will be excluded because Ms. Abarca consented to this search.  As a result,

26   / / /

27   / / /

28   / / /

1    IT IS ORDERED that Defendant's Motion to Suppress (Doc. # 18) is DENIED.

2    DATED this 23rd day of July, 2007.

3

4

5    _____
     James A. Teilborg
6    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28